748 A.2d 1065

**Marc Jeffrey CHIMES**

v.

**Caroline Fleming MICHAEL.**

**No. 317, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 30, 2000.

Eric W. Bloom (Carol A. Joffe and Winston & Strawn, on the brief), Washington, DC, for appellant.

Patrick W. Dragga (Kevin G. Hessler, Vincent M. Wills and Dragga, Callahan, Hannon & Hessler, L.L.P., on the brief), Rockville, for appellee.

Argued before HOLLANDER, THIEME and ADKINS, JJ.

THIEME, Judge.

This is an appeal of a Judgment of Absolute Divorce entered on March 11, 1999, after a two-day trial during February in the Circuit Court for Montgomery County. On May 7, 1998, appellant Marc Jeffrey Chimes filed a Complaint for Custody, requesting custody and support of the parties' six-year-old daughter, Meryn. Appellee Caroline Fleming Michael counterclaimed for custody and divorce. Chimes then counterclaimed as well for divorce, a monetary award, future payment of proceeds from stock options when exercised, and legal fees.

Before trial, the parties agreed to joint legal custody, with Chimes having primary physical custody of the child. The issues contested at trial focused on marital property, primarily Michael's America Online employee stock options worth more than $10 million before taxes. The court below granted Chimes the use and possession of the family home and car, child support, a monetary award of $1,493,423.20, and an "if,

as and when" order directing the future distribution of stock options that were not yet fully vested. The court divided equally between the parties the marital property other than the stock options, including monetary proceeds resulting from the exercise of more than $1 million in options. As for the options, the court divided vested but unexercised options 75 percent to Michael and 25 percent to Chimes; the value of the vested options was rolled into Chimes's monetary award. The non-vested options will be subject to the same division, but only after application of a coverture fraction similar to the "Bangs formula" used for pension assets.[1] The coverture formula will exclude from division a portion of the options that increases with time. The longer Michael waits to exercise the options, the less money Chimes may receive. The court also set child support, by allocating Meryn's needs equally between parties. The Judgment was amended by an Order entered April 13, 1999, in order to clarify certain matters, including the tax rate and which options would be used to pay Chimes's "if, as and when" award. Michael fully satisfied the monetary award judgment, and Chimes accepted a sum representing the entire award. He nevertheless appeals the judgment and raises the following questions:

1. Did the trial court abuse its discretion when it awarded Chimes 25 percent of the marital stock option rights, while dividing equally all other marital property, including the proceeds of stock options granted and exercised during the marriage?

---

1. *See Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984). In *Bangs,* the chancellor awarded future shares in the husband's retirement benefits to the wife if, as, and when he received them. To calculate the wife's share, the benefits when received would be multiplied by .5 (her award share), then further multiplied by a fraction that represented the years of marriage divided by the total years of employment. *Id.* at 356, 475 A.2d 1214. In the instant case, the court ordered the "if, as, and when" share to be multiplied by Chimes's award share (.25), then further multiplied by a fraction representing the number of months between the grant of options and the dissolution of the marriage divided by the number of months between the grant of options and their exercise.

2. Did the trial court abuse its discretion by applying a coverture fraction or time rule similar to the so-called "Bangs formula" to adjust Chimes's rights in the stock options? [2]

3. Did the trial court err when it admitted and relied upon expert opinion as to the value of non-vested stock options, where the expert testified that it is not possible to value non-vested options within a reasonable degree of professional certainty?

4. Did the trial court abuse its discretion when it split the child's support needs equally between parties and denied accounting from the date of the filing?

Michael filed a motion to dismiss this appeal based on the fact that Chimes had been paid and accepted the monetary award before he filed a notice of appeal. We denied without prejudice, and she renewed the motion in her brief. We now grant her motion to dismiss as to the first three issues raised on appeal. We explain herein. As to the fourth issue, child support, we answer "yes, in part, and no, in part" to the question presented and we explain.

### Facts

Chimes and Michael were married on October 21, 1989. One child, a daughter named Meryn Michael Chimes, was born of the marriage on July 19, 1992. At the time of trial, Chimes and Michael were, respectively, forty-five and thirty-seven years of age.

When the parties married, Chimes was the primary breadwinner, and he remained so until 1997. Michael worked freelance for over two years following Meryn's birth. In May 1995, she went to work for America Online (AOL), where she is still employed. Chimes lost his consulting job of ten years in December 1997, and he remains unemployed. By his own testimony, his efforts to seek new employment have been quite limited.

---

2. This question combines three questions raised by Chimes.

During the time they lived together, any money the parties earned went into, and any expenses the parties paid came out of, the joint family account. When Meryn was an infant, the parties hired a full-time care giver and housekeeper, Della Aguilar, who has continued to work for Chimes to date on a part-time basis.

The parties' marriage was troubled for a long time prior to the divorce. They began discussing separation in 1993, and in spring 1996, Chimes gave a neighbor a copy of a draft separation agreement. A month before the separation, Chimes informed Aguilar, and Michael moved out on December 20, 1996.

Michael obtained her employment at AOL through family contacts. When she began work there, she was granted options for 12,000 shares of stock. Three thousand of those options vested after her first anniversary with the company and an additional 3,000 per year vested on May 30 of 1997, 1998, and 1999. Michael was granted 1,000 additional options in October 1997. These options vested at the rate of 250 per year on October 31 of 1997, 1998, and 1999. The final 250 will vest October 31, 2000. Thus, when the parties separated, on December 30, 1996, only 3,000 options of the 13,000 granted had vested, and the market price of AOL stock was $33.25 per share.

On August 29, 1997, AOL granted Michael 1,000 more options, scheduled to vest at the rate of 250 per year on August 29 of 1998, 1999, 2000, and 2001. On September 1, 1998, almost two years after the parties' separation, Michael received another 1,300 options, slated to vest at the rate of 325 per year on September 1 of 1999, 2000, 2001, and 2002. The value of AOL stock fluctuates, but it has "increased wildly," in the chancellor's words, since the grants.[3]

---

**3.** Our research showed that during the week of oral argument, AOL stock hovered between $55 and $57 per share. Because of the merger between AOL and Time–Warner, the value of AOL stock had declined in recent weeks from its value at the time of the trial. The stock has split, nevertheless, an amazing *five* times since Michael began to acquire

Chimes's expert acknowledged at trial that the stock options were granted to Michael, in part, as an incentive for her continued employment with AOL. The AOL stock option plan states:

> A Participant who ceases to be an employee, director or consultant of the company or of an Affiliate (for any reason other than termination "for cause," disability or death) may exercise any Option granted to him or her to the extent that the Option is exercisable on the date of such termination of service, in accordance with the pertinent Option Agreement.

An option holder who becomes disabled may exercise any options within one year of the date of termination for disability, and an optionee's estate may exercise any options within one year of death. According to the plan, the options are not transferrable by Michael; nor may they be assigned, pledged, or hypothecated in any way; nor are they subject to execution, attachment, or similar process.

The parties stipulated that all options, both vested and non-vested, were marital property. As of the trial date, Michael held 45,000 vested options from the first grant, 1,348 from the second grant, and 1,000 from the third grant. The parties agreed at the trial that these options were worth in excess of $7.2 million before taxes, and $3.9 million after taxes. The parties also stipulated that, on the day of the trial, Michael owned 31,600 non-vested options, including 24,000 from the first grant, 2,000 from the second grant, 3,000 from the third grant, and 2,600 from the fourth grant. The majority of these shares, 24,000, vested about three months after the trial. Chimes's expert valued the non-vested shares at $4,151,499, whereas Michael's expert, Jeffrey Capron, testified "that it is not possible to identify a value for non-vested options within a reasonable degree of professional certainty," and that the "better view" is that valuing non-vested options is "so speculative" that an opinion cannot be rendered. Capron's proposed

---

options, and each time the stock split, her number of options likewise increased and the "strike" price to exercise those options decreased. *See* Yahoo! Finance (visited Mar. 6, 2000) <http://finance.yahoo.com>.

method of distribution for the "if, as and when" award was to apply a coverture fraction, *see supra*, note 1, to non-vested options. This methodology effectively dilutes Chimes's share over the long run, if Michael delays in exercising them. The trial court admitted Capron's testimony, over Chimes's objections.

After a two-day trial on the merits, the court below granted the parties a Judgment of Absolute Divorce and entered in favor of Chimes a judgment of $1,493,423.20, representing 50 percent of the marital property, including the proceeds of those options that had been exercised before the date of divorce, and 25 percent of the after-tax value of vested stock options that had not been exercised.[4] The court also divided the non-vested options 75 percent to Michael and 25 percent to Chimes, to be distributed on an "if, as and when" basis. The non-vested options were subject to the coverture fraction.

The trial court found Meryn's support needs to be $2,250 per month, and it split those costs evenly between Chimes and Michael. Because Chimes is the custodial parent, Michael must pay him $1,000 per month. She also covers the child's health insurance premiums. The court denied Chimes's request for attorneys' fees and costs.

On March 2, 1999, Michael filed a Motion to Alter or Amend the Judgment. An Order amending the Judgment was entered on April 15, 1999. On May 3, following Michael's payment in full, Chimes filed a line indicating that the judgment had been satisfied.

## Discussion

### I

Chimes's first three questions address the court's methodology for dealing with the stock options, especially those options

---

4. On December 16, 1998, Michael exercised 21,000 stock options and realized gross proceeds of $1,945,860 ($1,225,552 after taxes were withheld). She used some of the proceeds for taxes, and legal and accounting fees. At trial, $970,000 after-tax proceeds remained in her money market account at Chevy Chase Bank.

that had not vested at the time of trial. He objects to the 75:25 division of all unexercised options, as well as to the court's use of the coverture formula for the non-vested options and reliance on Michael's expert witness for testimony on eventual distribution of the proceeds. Michael moves to dismiss these issues. We find her rationale for dismissal to be dispositive, and we therefore grant her motion, declining to reach the merits of Chimes's appeal.

Michael argues, and we agree, that by accepting the benefits of the trial court's judgment—indeed, the full satisfaction of the monetary award—Chimes has "lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken." *Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531 (1966); *see also Suburban Dev. Corp. v. Perryman*, 281 Md. 168, 171, 377 A.2d 1164 (1977) ("It is a well-established rule in this State that unless the decree also adjudicates a separate and unrelated claim in favor of a litigant, he cannot, knowing the facts, both voluntarily accept the benefits of a judgment or decree and then later be heard to question its validity on appeal."); *Bowers v. Soper*, 148 Md. 695, 696, 130 A. 330 (1925) ("Upon the plainest principles of estoppel [appellant] is prevented from successfully disputing a disposition of funds thus made with his consent."); *Stewart v. McCaddin*, 107 Md. 314, 318–19, 68 A. 571 (1908) ("He thus acquiesced in, and invoked the authority of, the very order from which he had appealed.... Under these circumstances, he cannot be permitted to question the validity of the order."). More recently, we reiterated this principle in *Fry v. Coyote Portfolio, LLC*, 128 Md.App. 607, 616, 739 A.2d 914 (1999):

> It is well settled in Maryland, and the law generally is to the effect, that, if a party, knowing the facts, voluntarily accepts the benefits accruing to him under a judgment, order, or decree, such acceptance operates as a waiver of any errors in the judgment, order, or decree and estops that party from maintaining an appeal therefrom.

Events that transpired since the judgment convince us that Chimes recognized the validity of the Judgment of Absolute

Divorce, as amended, and took action inconsistent with his right to appeal by eagerly accepting the benefits of that judgment, even as he twice filed Notices of Appeal.

In the Judgment of Absolute Divorce, Chimes received from the trial court a monetary award in his favor for $1,493,423.20. The judgment was docketed on March 11, 1999, and Michael satisfied it within weeks. On March 19, she sent Chimes a check for $750,000 in partial satisfaction. On about March 29, pursuant to Chimes's instructions, Michael transferred an additional $727,552.20 to his attorney's escrow account. She delivered the final installment, a check for $15,871, to Chimes's attorney on April 13.

Chimes wasted no time in accepting the judgment's benefits. Only eight days after the judgment was docketed, he accepted and negotiated Michael's first check. Less than a week later, on March 25, he filed a Request for a Writ of Garnishment—as was his right—to execute on the unsatisfied portion. Although the writ was never served, the docket shows that Chimes *personally* procured it, as agent for his attorney. On April 9, when he had received all but the small final installment of the award, Chimes filed a Notice of Appeal with this Court, challenging the trial court's equitable distribution of the same. On April 28, when he filed the statement of satisfaction required by Maryland Rule 2–626(a),[5] Chimes also filed a second Notice of Appeal for the judgment as it had been amended by the order of April 13. He now stands before this Court, having accepted almost $1.5 million from the equitable distribution of marital assets, and appeals the same.

Chimes argues that he has not accepted any portion of the "if, as and when" award of non-vested options, and that such award is independent from the monetary award entered by

---

5. Rule 2–626(a) states:

> Upon being paid all amounts due on a money judgment, the judgment creditor shall furnish to the judgment debtor and file with the clerk a written statement that the judgment has been satisfied. Upon the filing of the statement the clerk shall enter the judgment satisfied.

the chancellor. He contends that the monetary award is "unrelated to, or independent of, the unfavorable portion of the decree," *i.e.,* the award of non-vested options and, thus, "acceptance of the benefit under [this] unrelated or independent portion of the decree will not result in a waiver of the right to appeal from the other unfavorable independent portion of the decree." *Fry,* 128 Md.App. at 616, 739 A.2d 914. We disagree.

Chimes's reading of the Maryland law of equitable distribution clearly contradicts our statutes and cases. Although a marital estate may include many categories of property—real estate, vehicles, retirement funds, stock portfolios, bank accounts, jewelry, antiques, collectibles, precious metals—all the property together is but a single pie to be divided between the divorcing parties. Thus, a judgment of divorce might divide the various forms of property in differing proportions, but at bottom it is a unitary plan for the distribution of assets. Title 8 of the Family Law Article makes this scheme clear. The court first must identify all marital property before it begins the process of distributing it. *See* Md.Code (1984, 1999 Repl. Vol.), § 8–203(a) of the Family Law Article. Next, the court must determine the economic value of all marital property, except retirement benefits. *See* Md.Code (1984, 1999 Repl. Vol.), § 8–204 of the Family Law Article. Finally, if division of property by title is unfair, the court must use the factors under section 8–205(b) to adjust the equities and rights of the parties by granting a monetary award. *See* Md.Code (1984, 1999 Repl.Vol.), § 8–205(b) of the Family Law Article. If one element of the plan changes, the other elements will necessarily shift so that the overall result is equitable. *See, e.g., Long v. Long,* 129 Md.App. 554, 579, 743 A.2d 281 (2000) (the chancellor "has been granted all the discretion and flexibility he needs to reach a truly equitable outcome," and "[o]ur statutes give him considerable discretion in balancing cash awards against alimony and future awards from retirement accounts"); *Doser v. Doser,* 106 Md.App. 329, 351, 664 A.2d 453 (1995) ("If the court determines that the division of marital property based on title would be unfair, the court has

several options. It may order a party to pay a fixed sum of cash and immediately reduce that order to judgment; it may establish a schedule for future payments of all or part of the award; it may transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from one party to the other.") (citations omitted).

Even if our family law precedents were not so clear, we also note that a claim for equitable distribution forms but one "convenient trial unit" under Maryland's "transaction test" analysis for the purposes of issue and claim preclusion. *See Kent County Bd. of Educ. v. Bilbrough*, 309 Md. 487, 525 A.2d 232 (1987). In *Bilbrough*, the Court of Appeals approved the American Law Institute standard for determining which issues comprise a single "transaction" and may be considered part of the same claim, and which comprise a "series" of separate, though related, transactions and must be treated as different claims:

> What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Id.* at 498, 525 A.2d 232 (quoting Restatement (Second) of Judgments § 24); *see also Gertz v. Anne Arundel County*, 339 Md. 261, 269-70, 661 A.2d 1157 (applying *Bilbrough* "time, space, origin, or motivation" factors), *cert. denied*, 339 Md. 261, 661 A.2d 1157 (1995). Because our statutory scheme promotes a unitary plan for the distribution of assets, equitable distribution can only be, in our view, a single transaction involving several categories of property. Moreover, we have little doubt that the underlying motivations and the parties' expectations here were at one time the same regardless of category of property. They simply sought to divide all the property fairly.

Chimes now creates an artificial distinction between the vested and non-vested options. We, however, perceive these two categories as having the same characteristics of time, space, origin, and motivation. AOL, the single originator, was motivated to grant Michael *all* of the options as part of her compensation. Although the four different grants had been offered to Michael at four different times during her employment, some options from *each* grant had vested as of the divorce and some had not. The monetary award that Chimes has already recognized and from which he has benefitted encompassed the options from *each* grant that had already vested as of the divorce. Thus, the distinction between vested and non-vested options has no real meaning in determining the fault lines between "convenient trial units," because both types of options shared the same significant characteristics. Armed with his pseudo-distinction, Chimes cannot appeal the judgment.

■   Chimes also insists that his appeal is not barred because he seeks only to increase an award that is an undisputed minimum. He believes this to be true because Michael dismissed her cross-appeal. *See Dietz v. Dietz,* 351 Md. 683, 685, 720 A.2d 298 (1998) ("the acquiescence rule does not apply where there is no cross-appeal and the appellant seeks only an increase in an undisputed minimum"). That Chimes's award might increase on remand is not enough, however, to convert his monetary award to an "undisputed minimum."

Although *Dietz* involved an appeal of a monetary award made during equitable distribution, it may be distinguished from the instant case on its facts. In that case, the trial court ordered the award, which represented the husband's interest in a partnership, to be paid in monthly installments of $1,250 over a fifteen-year period. *Id.* at 686, 720 A.2d 298. When we heard *Dietz,* we barred the appeal, holding that the exception to the acquiescence rule for spousal support cases, *see, e.g., Lewis v. Lewis,* 219 Md. 313, 149 A.2d 403 (1959), did not apply, because a monetary award is not spousal support. *See Dietz v. Dietz,* 117 Md.App. 724, 739, 701 A.2d 1144 (1997).

*Cf. Lewis,* 219 Md. at 317, 149 A.2d 403 ("the bar cannot be raised where the [alimony] benefits accruing to the wife, by reason of the award, provide necessary support until the final adjudication of the case").

Reversing our holding, the Court of Appeals equated the monthly award payments made to Mrs. Dietz to those payments made in the context of workers' compensation, alimony, and condemnation cases, and it held that the acquiescence rule did not bar the appeal. *Id.* at 692–93, 720 A.2d 298 ("Rather, our decisions in the workers' compensation, spousal support, and condemnation contexts are the *most analogous* to the instant matter.") (emphasis added). Although it by no means sought to blur the distinction between alimony and monetary awards, *see McAlear v. McAlear,* 298 Md. 320, 347–48, 469 A.2d 1256 (1984) (despite similarities in form and interdependence between the two, a monetary award paid out in installments is distinct from alimony), the Court of Appeals treated the two types of award alike under the acquiescence rule. Yet, the Court reminded us that "the acquiescence doctrine 'is a severe one and should not be extended.'" *Dietz,* 351 Md. at 695, 720 A.2d 298 (quoting *Lewis,* 219 Md. at 317, 149 A.2d 403) (citing *Petillo v. Stein,* 184 Md. 644, 649, 42 A.2d 675 (1945)). For that reason, it held that "[t]he holding in *Lewis* should not be read to mean that the acquiescence rule applies in divorce cases unless the order under which benefits have been taken and which has been appealed is an order for support...." *Id.* Instead, "the acquiescence rule does not apply where there is no cross-appeal and the appellant seeks only an increase in an undisputed minimum." *Id.*

As we read *Dietz* today, the Court of Appeals reached its conclusion based on the alimony-like *effect* of a scheme of monthly payments, rather than on that scheme's actual nomenclature. In workers' compensation, alimony, and condemnation cases, which the Court found analogous to the facts in *Dietz,* the defendant enters the litigation with a clear understanding that he owes a specific statutory or common law obligation to the plaintiff, whether it be the cost of medical treatment, support for necessities, or the fair market value of

land. *See, e.g., Bethlehem Steel Co. v. Mayo*, 168 Md. 410, 413, 177 A. 910 (1935) (workers' compensation case, stating that acquiescence rule does not apply "where the right to the benefit received is conceded by the opposition party, or where the appellant would be entitled thereto in any event"). Here, the large lump sum award already enjoyed by Chimes does not have the support-like effect of the payments made in *Dietz*.[6] The analogy is ineffective.

*Dietz* is also distinguishable from the present case in that Mrs. Dietz only accepted a small portion of the judgment before she appealed. *See also Sanford*, 295 N.W.2d at 142 (payments totaling $18,7000 already accepted by wife were insubstantial amount in light of the entire marital estate at issue). Chimes, in contrast, accepted the *entire* monetary award, even seeking to execute on its unpaid portions and filing a Notice of Appeal on the same day that he entered a line stating that the judgment had been satisfied.

Finally, although *Dietz* considerably broadens the exception stated in *Lewis* to the acquiescence rule, it does not, we believe, eviscerate that rule. If we were to construe *Dietz* as Chimes would like us to, we would open the floodgates for divorce litigants to collect on money judgments, then return to the court via the appellate process to ask for more money. We would also effectively require every payor on such judg-

---

**6.** *Dietz* is the only Maryland case that addresses the "undisputed minimum" exception to the acquiescence rule for non-support elements of the divorce judgment. Our holding today may conflict with authority from other states, some of which our Court of Appeals cited with approval in *Dietz*. Yet, to stretch that case further invites a flood of appeals. Out-of-state authority, moreover, does not bind us. Some of those cases actually track with the limitation we perceive in *Dietz*. *See, e.g., In re Marriage of Abild*, 243 N.W.2d 541 (Iowa 1976) (denying dismissal of appeal where appellant accepted $200 monthly payments under decree and appellee did not cross-appeal); *Sanford v. Sanford*, 295 N.W.2d 139 (N.D.1980) (denying dismissal of appeal when appellant accepted monthly payments of $1,700 and a $50,000 monetary award that went to cover attorney's fees and appellee did not cross-appeal). *See generally* E.T. Tsai, *Spouse's Acceptance of Payments Under Alimony or Property Settlement or Child Support Provisions of Divorce Judgment As Precluding Appeal Therefrom*, 29 A.L.R.3d 1184 (1970 & Supp.1999).

ments who finds herself before our Court to prosecute vigorously a cross-appeal—and not just present an appellate defense—in order to protect her interests. We cannot imagine that the Court of Appeals intended such a result when it handed down *Dietz.*

Thus, Chimes's appeal on the equitable distribution issues runs afoul of the acquiescence rule of *Rocks v. Brosius* and other cases. We therefore dismiss it under Maryland Rule 8–602(a), as this Court may dismiss any appeal that is not allowed by Maryland Rules or by other law.[7]

## II

In a separate question, Chimes argues that the trial court abused its discretion by dividing the liability for child support equally between the parties. Under the judgment and the parties' parenting agreement, Meryn remains in Chimes's physical custody, and each month Michael pays Chimes $1,000 of the $2,250 per month found by the trial judge to represent the child's needs.[8] Chimes contends that the court failed to follow the statutory child support guidelines. He argues that Michael's share of Meryn's support should be larger, because i) she was the only party with regular employment at the time of the judgment and ii) the court had awarded her 75 percent of the vested and exercisable stock options. He complains that the court erroneously discounted the actual cost of child care, which was established before the separation. Finally, he claims that child support should have been calculated from the date of the initial pleading under Md.Code (1984, 1999 Repl. Vol.), § 12–101(a)(1), because he had sought *pendente lite* support in that pleading. Even if he had preserved all of the foregoing arguments for appeal, Chimes portrays the decision in the starkest of terms, omitting those nuances that bring the

---

7. Rule 8–602(a) states in relevant part: "On motion or on its own initiative, the Court may dismiss an appeal for any of the following reasons: (1) the appeal is not allowed by these rules or other law...."

8. Michael also pays Meryn's health insurance premium of $225 per month.

judgment, for the most part, within the chancellor's sound discretion. We find no abuse of discretion regarding Meryn's basic support and retroactivity, but we remand on the issue of child care expenses.

■ First, Chimes cannot argue now that the child support guidelines apply, because he did not preserve that issue. Under Maryland Rule 8–131(a), this Court will "[o]rdinarily . . . not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." The purpose of this rule is to "require counsel to bring the position of his client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings." *Clayman v. Prince George's County*, 266 Md. 409, 416, 292 A.2d 689 (1972). The rule is effectively a form of estoppel—it curbs appeals that are inconsistent with the parties' positions at trial. The record shows that Chimes failed to take issue with the trial court's decision not to use the child support guidelines under Maryland Code (1984, 1999 Repl.Vol.), § 12–204 of the Family Law Article, although that issue was discussed extensively during the trial. We thus believe he has no basis to argue on appeal that the trial court abused discretion by taking the case out of the guidelines.

Although the child support guidelines apply in most cases, the trial court may exercise discretion in setting the basic support obligation when the combined adjusted actual income of the parents exceeds $10,000 per month.[9] *See* § 12–204(d).[10]

---

**9.** Under Md.Code (1984, 1999 Repl.Vol.), § 12–201(a) through (e) of the Family Law Article, the "combined adjusted actual income" takes into account the actual income of both parents minus any preexisting reasonable child support obligations actually paid; alimony or maintenance obligations actually paid (except as provided in section 12–204(a)(2)); and the actual cost of providing health insurance coverage for a child for whom the parents are jointly and severally responsible. "Actual income" includes ordinary wage and salary income; retirement and disability benefits, and such windfall income as gifts, prizes, severance pay, and capital gains.

**10.** Section 12–204(d) states: "If the combined adjusted actual income exceeds the highest level specified in the schedule in subsection (e) of

"The legislative history and case law do not obscure the fact that the Legislature left the task of awards above the guidelines to the chancellor precisely because such awards defied any simple mathematical solution." *Bagley v. Bagley,* 98 Md.App. 18, 39, 632 A.2d 229 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191 (1994). Allowing judicial discretion promotes the policy behind the guidelines, that, even at very high income levels, "a child's standard of living should be altered as little as possible by the dissolution of the family." *Voishan v. Palma,* 327 Md. 318, 328, 609 A.2d 319 (1992) (quoting Maryland Attorney General's *amicus curiae* brief).

■ Here, the trial court determined early on that, based on the parties' income, the child support guidelines were not dispositive. Chimes agreed with, if not encouraged, that decision:

[APPELLANT'S COUNSEL]: Well, there are two issues. Once the property is adjusted they each may have additional income.

THE COURT: That might take it out of the guidelines?

[APPELLANT'S COUNSEL]: Yes. *I believe it is out of the guidelines, Your Honor, anyway.*

THE COURT: *So we are not using the guidelines.*

[APPELLANT'S COUNSEL]: *I believe it is above the guidelines.*

Chimes's attorney again acknowledged during closing arguments that the child support guidelines did not apply. She also agreed that, because the case fell under the rule for parents who exceeded the income level of the guidelines, child support should be determined by first examining Meryn's needs. Thus, Chimes argued during the trial for an above-guidelines determination of child support, and he is estopped from now arguing, as he did in his initial brief, that the guidelines should strictly apply. *Cf. Osztreicher v. Juanteguy,* 338 Md. 528, 659 A.2d 1278 (1995) (holding that plaintiff's

---

this section, the court may use its discretion in setting the amount of child support."

decision not to present evidence constituted acquiescence to the trial court's unfavorable rulings on preliminary motions and precluded appellate review of those motions).

Even if we were to assume that Chimes fully preserved this issue, the chancellor's decision on the basic obligation should not be disturbed, because he did not abuse his discretion. In cases such as this one, where the guidelines do not apply, calculation of child support falls within the chancellor's sound discretion. The chancellor will "examine the needs of the child in light of the parents' resources and determine the amount of support necessary to ensure that the child's standard of living does not suffer because of the parents' separation." *Voishan*, 327 Md. at 332, 609 A.2d 319. The Legislature gave the trial court fairly broad discretion in these matters. In fact, an award of child support in an above-guidelines case will be disturbed "only if there is a clear abuse of discretion." *Id.* at 331, 609 A.2d 319.

Here, the chancellor's consideration of property issues gave him sufficient information to address the child support issue. The chancellor knew about the income and resources available to each of the parties, including Chimes's nearly $1.5 million monetary award. He knew that Michael earned $65,000 per year in her job at AOL. The chancellor knew, moreover, from Chimes's own testimony and exhibits, that Chimes had the proven ability to earn better than $120,000 per year and that his efforts to find a new job had been minimal.[11]

After he determined, with Chimes's approval, that the parties' incomes exceeded the maximum amount under the guidelines, the chancellor, in accordance with *Voishan*, determined Meryn's reasonable needs using Chimes's own financial statement. *See id.* at 331–32, 609 A.2d 319. At the suggestion of Chimes's attorney, he eliminated attorneys' fees from the child's list of needs, thus reducing her total monthly requirements from $5,106 to $3,106. The chancellor also eliminated

---

11. Under § 12–204(b)(1), "if a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income."

Chimes's stated child care expense of $960 per month, explaining that "[a]t the present time he is full time at home and providing the care for his child." He noted that the child care expense was inflated anyway, considering that the daycare provider only attended to Meryn for two and one-half hours per day. Evidence presented during the merits hearing also showed that Chimes's financial statement erroneously attributed certain other expenses to the child, including her health insurance, an expense that Michael bears. Additionally, the chancellor found that attributing $113 per month to the child for Chimes's disability insurance was "a stretch."

Armed with a pared-down list of expenses related to the child, the chancellor determined that $2,250 per month was reasonable for her support. He then told the parties, "If you think that number is off line, let me know. It is on the high side, but she should enjoy the benefits that her parents are going to enjoy." Chimes's attorney, we note, said *nothing* in response to the court's invitation to comment. The chancellor then apportioned the obligation between the parties.

From the record, it is clear that the chancellor made this decision based on sufficient evidence. Furthermore, we note from our examination of the record that the chancellor gave Chimes's attorney the opportunity to object to his decisions and offer comments along the way. Some of the key findings were based on Chimes's own financial statements and exhibits. Although Chimes may disagree with the outcome now, he and his attorney were active participants in its creation. We find no clear error in the findings of fact and no abuse of discretion regarding the basic support obligation.

We do, however, take issue with the chancellor's reading of the child care provisions of the guidelines statute, Md.Code (1984, 1999 Repl.Vol.), § 12–204(g) of the Family Law Article. Chimes argues that the chancellor "excluded the actual cost of child care established before the separation," the $1,200 that the parties paid Aguilar each month for watching the child after school and performing various domestic tasks. He relies on *Krikstan v. Krikstan,* 90 Md.App. 462, 468–472,

601 A.2d 1127 (1992), which holds that the mandatory language of section 12–204(g) overrides the chancellor's discretion to set child care expenses. The chancellor, Chimes argues, evaluated the monthly child care expense as though it were within his discretion to do so; instead, he should have simply added the parties' monthly cost for Aguilar's services to the basic support obligation. We find merit in Chimes's argument.

First, the plain language of section 12–204(g) is pellucidly clear:

> [A]ctual child care expenses incurred on behalf of the child due to employment or job search of either parent *shall* be added to the basic obligation and *shall* be divided between the parents in proportion to their adjusted actual incomes.... Child care expenses *shall* be ... determined by actual family experience.

§ 12–204(g)(1) & (2)(i). We would find it difficult, after parsing the language of this section, to support an interpretation that leaves an award for child care expenses to the discretion of the chancellor, even in an above-guidelines case such as this one. As we held in *Krikstan,* 90 Md.App. 462, 471, 601 A.2d 1127 (1992), use of the word " '[s]hall' generally denotes an imperative obligation inconsistent with the idea of discretion." Michael argues, somewhat persuasively, that, because *Krikstan* is a guidelines case and the instant case is not, section 12–204(d) takes us outside of the guidelines here, too, and into the realm of discretion. We find language in section 12–204(g) itself, however, that tells us Michael defines a distinction without a difference—"[a]ctual child care expenses ... shall be added to the basic obligation." Because the Legislature used mandatory language *and* distinguished child care expenses from basic support obligations,[12] we hold that child care

---

12. A recent case from the Court of Appeals, *Drummond v. State,* 350 Md. 502, 714 A.2d 163 (1998), supports this analysis. In outlining the workings of the statutory regime, Judge Cathell wrote:

> In calculating a child support award, a court first must determine the adjusted actual income of each parent, as defined in section 12–201.

expenses always fall outside of the chancellor's discretion, and *Krikstan* governs the instant facts.

Our analysis here is consistent with the policy underlying the guidelines, as explained in *Voishan.* There, to illustrate the policy for the statute's above-guidelines provision, the Court of Appeals quotes with approval an *amicus* brief prepared by the Attorney General. The brief states:

> "Implicit in this judgment is the view that at very high income levels, the percentage of income expended on children may not necessarily continue to decline or even remain constant because of the multitude of different options for income expenditure available to the affluent. The legislative judgment was that at such high income levels judicial discretion is better suited than a fixed formula to implement *the guidelines' underlying principle that a child's standard of living should be altered as little as possible by the dissolution of the family.*"

*Id.* at 328, 609 A.2d 319 (emphasis added). We reasonably conclude that requiring the trial court to incorporate costs based on "actual family experience" supports the Legislature's intent of altering the life of the child as little as possible. Here, moreover, both parties endorsed Aguilar's continued employment for this very reason. Michael paid a portion of Aguilar's salary in 1998, and Chimes's attorney addressed the issue during the merits hearing:

> [APPELLANT'S COUNSEL]: This child care provider was hired by both of these parties when the child was born, and she has been working basically from noon until 6:00 p.m.,

---

It then adds the adjusted actual income of both parents to arrive at the combined adjusted actual income. A court next determines the basic child support award "in accordance with the schedule of basic child support obligations in subsection (e) [of section 12–204 of the Family Law Article]." The basic support obligation derived from the schedule in section 12–204(e) then is divided between the parents in proportion to their adjusted actual incomes. *Certain child care expenses and extraordinary medical expenses incurred on behalf of a child must be added to the basic child support obligation.* Transportation and school expenses may also be added.
*Id.* at 512, 714 A.2d 163 (citations omitted) (emphasis added).

and being paid this amount of money for many, many years prior to the separation.

This was a decision that both of the parents made to retain this person for the sake of their child, to provide continuity.

The chancellor based his decision on the cost of care relative to its benefit. If the statute allowed discretion, like the statute governing school expenses, *see* § 12–204(i),[13] his reasoning would pass muster. The Legislature, however, left no room for discretion, and we vacate and remand this portion of the judgment for modification.

■ Finally, Chimes also argues that the chancellor should have made the award retroactive to May 7, 1998, the date of his initial Complaint for Custody, rather than to March 1, 1999, as ordered in the Judgment of Absolute Divorce. He is wrong.

Chimes relies on Md.Code (1984, 1999 Repl.Vol.), § 12–101(a)(1) of the Family Law Article (emphasis added), which states:

> Unless the court finds from the evidence that the amount of the award will produce an inequitable result, for an initial pleading that requests child support *pendente lite*, the court *shall* award child support for a period from the filing of the pleading that requests child support.

Chimes's initial pleading was not, however, "an initial pleading that requests child support *pendente lite*," but, instead, was a Complaint for Custody that secondarily requested "child sup-

---

13. This section states:

> By agreement of the parties or by order of court, the following expenses incurred on behalf of a child *may be divided* between the parents in proportion to their adjusted actual incomes:
>
> (1) any expenses for attending a special or private elementary or secondary school to meet the particular educational needs of the child; or
>
> (2) any expenses for transportation of the child between the homes of the parents.
>
> § 12–204(i) (emphasis added).

port in accordance with the guidelines, *pendente lite* and permanently." Moreover, after Michael filed her counterclaim, Chimes filed a Supplemental Counterclaim for Absolute Divorce and Other Relief in June 1998. In this claim, Chimes requested custody of Meryn and "a reasonable sum as and for child support, *pendente lite* and permanently," just as he had done in the Complaint for Custody. Under *Shapiro v. Sherwood*, 254 Md. 235, 239, 254 A.2d 357 (1969) (" 'An amended pleading which is complete in itself and does not refer to or adopt a former pleading as part of it supersedes the former pleading.' ") (quoting 41 Am.Jur. *Pleading* § 313 (1942)), Chimes's counterclaim had the effect of superseding his initial Complaint for Custody. The counterclaim did not incorporate by reference or adopt the original complaint. The original complaint was never tried and, instead, the chancellor eventually tried the case on the basis of the counterclaims. In short, there exists no "initial pleading that requests child support *pendente lite* " in the instant case and no requirement to award child support retroactively. *See also Tanis v. Crocker*, 110 Md.App. 559, 570–71, 678 A.2d 88 (1996). Chimes's reliance on section 12–101(a)(1) is thus misplaced.

Instead, section 12–101(a)(3), which addresses all other pleadings, governs this case. This section reads: "For any other pleading that requests child support, the court *may* award child support for a period from the filing of the pleading that requests child support." § 12–101(a)(3) (emphasis added). By its plain language, section 12–101(a)(3) leaves to the discretion of the court that which section 12–101(a)(1) makes mandatory. *See Tanis*, 110 Md.App. at 570, 678 A.2d 88. "[I]t is within the discretion of the chancellor to determine whether to make the award retroactive to the time of filing." *Krikstan*, 90 Md.App. at 473, 601 A.2d 1127; *see also Dunlap v. Fiorenza*, 128 Md.App. 357, 371–72, 738 A.2d 312 (1999). The chancellor recognized the discretionary nature of his decision when he entered a Consent *Pendente Lite* Order, governing Meryn's custody and visitation. On that form, he left intentionally blank the spaces intended for information

about support.[14] He could have, in fact, awarded *pendente lite* support at that time, but he chose not to. At trial, moreover, the chancellor did not abuse his discretion by not back-dating the support award. Clearly, Meryn will not suffer for the lack of economic resources, because her father gained almost $1.5 million in assets as part of the divorce judgment, and he stands to gain more when Michael exercises her stock options. Payment of retroactive support was not required and the chancellor was within his sound discretion in choosing not to order it.

**APPEAL DISMISSED IN PART; JUDGMENT AFFIRMED IN PART, VACATED AND REMANDED IN PART TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY.**

**COSTS TO BE PAID BY APPELLANT.**

---

14. The court used dashes and the abbreviation "N/A," for "non-applicable."