993 A.2d 153

**Robert COCHRAN, et ux.**

v.

**GRIFFITH ENERGY SERVICE, INC. t/a Ewing Oil.**

**No. 19 Sept.Term, 2009.**

Court of Special Appeals of Maryland.

March 31, 2010.

**626**

Edward J. Brown, Ellicott City, MD, for Appellants.

Collin J. Hite, Richmond, VA and Sung B. Yhim, Baltimore, MD (R. Trent Taylor, Richmond, VA and Ava E. Lias–Booker, Baltimore, MD of McGuire Woods, LLP, on the brief), for Appellee.

Panel: DEBORAH S. EYLER, MEREDITH, and STUART R. BERGER (Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

This is the second appeal in a successful action by Robert and Suzanne Cochran ("the Cochrans"), the appellants, against Griffith Energy Services, Inc., t/a Ewing Oil ("Griffith"), the appellee, for damages caused by a fuel oil spill in the Cochrans' home. The primary issue now in dispute is the amount of post-judgment interest the Cochrans are entitled to receive.

A jury in the Circuit Court for Washington County found in favor of the Cochrans on their claims of negligence and breach of contract,[1] and awarded them $230,000 in damages. There-

---

1. The action originally was filed in Prince George's County but later was transferred to Washington County.

after, Griffith contacted the Cochrans several times to arrange payment of the judgment. The Cochrans did not respond to these communications.

In the meantime, the Cochrans pursued an appeal in which they challenged the imposition of sanctions against them for discovery violations and pretrial rulings disposing of certain of their claims.[2] In an unreported opinion, this Court rejected the Cochrans' appellate contentions and affirmed the judgment. *Cochran v. Griffith Energy Services, Inc.*, No. 215 September Term, 2007, 180 Md.App. 763, 180 Md.App. 765 (filed July 2, 2008) (*"Cochran I"*).

The Cochrans subsequently instituted execution proceedings to collect the $230,000 judgment plus post-judgment interest from the date judgment was entered forward. Griffith, believing that its efforts to pay the judgment had arrested the accrual of post-judgment interest, responded by filing a motion to deposit the $230,000 judgment, plus interest (although less than that claimed by the Cochrans), into the court registry, and to have the judgment declared satisfied. At the conclusion of a hearing, the circuit court ruled in favor of Griffith in the dispute over post-judgment interest, and granted its motion.

---

**2.** Specifically, the issues raised by the Cochrans in that appeal were as follows:

 A. Did the Circuit Court Err by Dismissing With Prejudice the Cochrans' Claim for Violation of Medical Records Confidentiality?

 B. Did the Circuit Court Err by Granting Griffith's Motion to Dismiss the Fraud Count (Count VII) and Granting Its Motion for Summary Judgment on the Same Count, and Further Violated the Cochrans' Due Process Rights?

 C. Did the Circuit Court Err By Granting Defendant's Motion in Limine Thereby Precluding Plaintiffs' Claim for Lost Business Opportunity?

 D. Did the Circuit Court Err by Granting Griffith's Motion for Summ[a]ry Judgment On the Cochrans' Consumer Protection Act Claim When There Was Evidence That Griffith Made Material Misrepresentations Regarding the Quality of ... Consumer Services It Provided to the Cochrans?

 E. Did the Circuit Court Improperly Award Sanctions Against Plaintiffs related to the "Second" Inspection, Without a Hearing?

In this appeal, the Cochrans challenge two orders of the circuit court stemming from the post-judgment interest dispute. We slightly reword their questions presented as follows:

I. Did the circuit court err by awarding only $5,544.88 in post-judgment interest?

II. Did the circuit court err by denying their recusal motion? [3]

For the reasons that follow, we shall affirm the judgment. We also shall grant a motion by Griffith to strike portions of the Cochrans' reply brief for failure to comply with the Maryland Rules.

## FACTS AND PROCEEDINGS

The $230,000 judgment at the center of this dispute was entered on Monday, March 5, 2007, at the close of a nine-day jury trial. The damages awarded consisted of the following:

- Robert and Suzanne Cochran: Additional Repair/Remediation/Assessment—$55,000; Diminution in value due to market resistance—$125,000; Past loss of rental value—$10,000;

- Robert Cochran: Past lost earnings—$0; Non-economic damages—$25,000;

- Suzanne Cochran: Non-economic damages—$15,000.

On Thursday, March 8, 2007, counsel for Griffith sent an e-mail to counsel for the Cochrans stating:

We do not foresee filing any post trial motions. [Griffith] wishes to put the matter behind them at this point. We would like to start the process to cut the check for judgment. I will need the full legal name and social security number for Mr. and Mrs. Cochran, plus your firm's Tax ID

---

**3.** The questions as worded by the Cochrans are:

A. Did the Circuit Court Err by Awarding Only $5,544.88 of Interest?

B. Did the circuit Court Err by Refusing to Recuse Itself?

Number. Let me know how the check should be payable....

Counsel for the Cochrans did not respond to this e-mail.

On April 4, 2007, the Cochrans noted an appeal in *Cochran I*. They did not challenge the jury's award of damages in their favor on their breach of contract and negligence claims; rather, they challenged the trial court's imposition of discovery sanctions against them and its pretrial rulings disposing of certain of their claims. Specifically, they asserted that the circuit court had erred in dismissing their claim for violation of the Maryland Medical Records Confidentiality Act, Md.Code (2005) section 4–301 *et seq.* of the Health General Article; granting summary judgment against them on their claim for fraud; dismissing as speculative their claim for "lost business opportunities"; and dismissing their claim for violation of the Maryland Consumer Protection Act, Md.Code (2005) section 13–101 *et seq.* of the Commercial Law Article ("CL"). Griffith did not note a cross-appeal or otherwise challenge the jury verdict.

On May 30, 2007, two months after the appeal in *Cochran I* was noted, counsel for Griffith again wrote to counsel for the Cochrans (this time via facsimile and U.S. mail) expressing his client's desire to pay the judgment. He opined that, given that the Cochrans "only [were] appealing the rulings on [Griffith's] dispositive motions," and therefore were not challenging the $230,000 jury verdict on appeal, "there [was] no reason not to resolve the judgment as we had expressed back on March 8, 2007." Counsel for Griffith continued:

Liberty Mutual [Griffith's liability insurance carrier] is prepared to tender the judgment amount of $230,000, as it has been willing to do since we wrote back in early March. We request that you please indicate no later than June 1, 2007 if the [Cochrans] are willing to accept the tender of this amount.

If we do not hear from you by 5 p.m. this Friday we will consider the tender rejected by the [Cochrans]. Please

respond in writing so that we may relay the response to our client and its insurer.

Counsel for the Cochrans did not respond to this correspondence either.

More than a year went by. On July 2, 2008, this Court filed the opinion in *Cochran I*, affirming the judgment below. Then, on July 30, 2008, counsel for Griffith wrote counsel for the Cochrans to express for a third time his client's intention to pay the $230,000 judgment. (The letter again was sent via facsimile and U.S. mail.) Counsel for Griffith asked to whom the check should be made payable, and again asked for the Cochrans' social security numbers and the tax ID number for their counsel's firm.

Again, counsel for the Cochrans did not respond.

On November 19, 2008, shortly after the Court of Appeals denied the Cochrans' petition for writ of *certiorari*, and about one year and eight months after the judgment was entered, the Cochrans' lawyer sent a letter to Griffith's lawyer captioned: *"NOTICE TO PRESERVE EVIDENCE PENDING INITIATION OF SUIT."* The letter set forth counsel's intent to bring suit on behalf of the Cochrans' two adult children against Griffith and the law firm representing it, and asked that "all evidence concerning the non-disclosure of the increase in the benzene finding be preserved, including but not limited to all communications between Griffith, Griffith's counsel, Griffith's insurer and their experts, as well as all billing records for this time period."

In reference to the prior unanswered correspondence from counsel for Griffith, the Cochrans' attorney wrote as follows:

> [A]lthough I appreciate what we affectionately refer to as "set-up" letters in the bad faith context, please be advised that [the Cochrans] will commence execution efforts immediately upon [Griffith] for the full amount of the judgment, interest and costs. As your local counsel will advise you,[4]

---

4. Griffith was represented by several out-of-state attorneys admitted *pro hac vice*.

acceptance of payment in Maryland absent an express, unequivocal agreement terminates the appeal, and Liberty Mutual was required to file a Md. Rule 8–424 complaint Affidavit and Written Undertaking in the Circuit Court for Washington County, Maryland, not simply "tender" letters. In any event, our judgment is against [Griffith], not Liberty Mutual, and thus [the Cochrans] will proceed immediately with the remedies provided by Md. Rule 2–633 *et seq.* against Griffith until the outstanding amount of $278,438.36 (as of 11/14/2008) is fully satisfied. By my calculation the per diem interest amount is $63.01, so the above figure should be adjusted daily by this amount.

With respect to this issue, as it appears that your interests lie with Liberty Mutual, we would ask that you forward a copy of this letter to Griffith's non-insurer retained counsel, as it is their assets, accounts and property which will be garnished or attached. In light of transparent effort on Liberty's behalf, as evidenced, for example, by its May 30, 2007 correspondence, to fail to protect its insured pursuant to Md. Rule 8–424 while also refusing to even offer to satisfy the full amount owed, we will also proceed with a direct action against Liberty Mutual pursuant to *WMATA v. Queen,* 324 Md. 326, 597 A.2d 423 (1991). We will send a courtesy copy of this suit to you following service upon the M.I.A.

Liberty has obviously had the benefit of the money for which it is now attempting to renege on its obligation to its insured, for its own interest, so we would request that Griffith's non-insurer retained counsel contact us upon receipt of this letter to discuss possible assignment of claims and/or joinder in the action against Liberty, in exchange for a short term stay of discovery and execution upon them.

On November 21, 2008, the Cochrans filed discovery requests "in aid of enforcement," including a notice of deposition of a designee of Griffith, scheduled for December 30, 2008, interrogatories, and a request for production of documents. *See* Md. Rule 2–633(a) (providing that "[a] judgment creditor may obtain discovery to aid enforcement of a money judgment

(1) by use of depositions, interrogatories, and requests for documents, and (2) by examination before a judge or an examiner as provided in section (b) of this Rule").

On December 3, 2008, Griffith filed a "Motion to Deposit Judgment Funds into the Court Registry and Declare Judgment Satisfied" ("motion to deposit"). It recited its attempts to pay the judgment to the Cochrans and argued that post-judgment interest ceased accruing on June 1, 2007, the deadline for acceptance of payment that was set by Griffith's May 30, 2007 letter. Griffith requested deposit of an attached check for $235,544.88 (the $230,000 judgment plus $5,544.88 in interest) in the court registry, and to have the court enter an order declaring the judgment satisfied. Finally, it asked the court to offset the appeal costs awarded to Griffith by this Court in *Cochran I* against any judgment and interest owed to the Cochrans.

On December 9, 2008, the court entered an order depositing the $235,544.88 into the registry "for the protection and custody of said judgment funds until release or disbursement is ordered...." ("Deposit Order"). The Deposit Order did not resolve the interest dispute or declare the judgment against Griffith satisfied.

On January 12, 2009, the Cochrans filed a motion to vacate or, in the alternative, to reconsider the Deposit Order. They asserted that Griffith and/or Liberty Mutual had filed the motion to deposit, rather than simply pay the Cochrans the amount it owed them, "in response to [the Cochrans'] need to resort to discovery in aid of enforcement and [their] initiation of a new action [against Liberty Mutual in the Circuit Court for Baltimore City]." [5] They further asserted that the court's action would deprive them of the funds owed to them, and, if deemed to temporarily toll the accumulation of interest, would cost them "at minimum ... an additional $3,3339.72 [sic]."

---

5. The Cochrans had filed suit against Liberty Mutual in the Circuit Court for Baltimore City on December 23, 2008.

On February 6, 2009, the court held a hearing on Griffith's request to have the judgment declared satisfied and to resolve the dispute over post-judgment interest. Counsel for the Cochrans argued, *inter alia,* that, if the Cochrans had taken payment of the $230,000 judgment, they would have been foreclosed, under the "acquiescence rule" (which we shall discuss below) from pursuing their appeal in *Cochran I.*

After listening to arguments of counsel, the judge ruled orally from the bench. He concluded that the acquiescence rule did not apply to the appeal in *Cochran I* and that Griffith had made a valid tender of the judgment on March 8, 2007, which stopped the accrual of post-judgment interest as of that date. Nonetheless, because Griffith had offered to pay post-judgment interest until June 1, 2007, and was not withdrawing that offer, the court awarded the Cochrans interest accrued until that date; it therefore found the judgment satisfied by the $235,544.88 deposited into the court. The court further ruled that the amount due to the Cochrans be offset by the costs due to Griffith in *Cochran.* At the close of the hearing, however, the Cochrans agreed to provide Griffith with a check for the appeal costs. For that reason, the court removed the offset provision from the written order it subsequently issued.

## DISCUSSION

### I.

### Post–Judgment Interest

The Cochrans advance two main arguments to support their contention that the circuit court erred by awarding them only $5,544.88 in post-judgment interest. First, they argue that had they accepted payment of the judgment when Griffith offered to pay it, they would have forfeited their appeal in *Cochran I,* under the acquiescence rule, and the circuit court mistakenly relied on *Dietz v. Dietz,* 351 Md. 683, 720 A.2d 298 (1998), to conclude otherwise. They maintain that for this reason they were not obligated to accept payment of the judgment until (at the earliest) the appeal process in *Cochran*

*I* had concluded. In the interim, they were entitled to earn the statutory 10% interest on the judgment. *See* Md.Code (2006), section 11–107(a) of the Courts and Judicial Proceedings Article ("CJ") (stating that, with exceptions not applicable here, the legal interest rate post-judgment is 10 percent per annum on the amount of the judgment). Second, the Cochrans attack Griffith's offers of payment as insincere and legally inadequate to constitute valid tenders.

The Cochrans supplement their two-pronged challenge with additional arguments that the circuit court's resolution of the post-judgment interest dispute exceeded its "limited power to decide the date upon which [the] mandatory obligation [to pay post-judgment interest] commences," and that Liberty Mutual should have acted to protect the interests of its insured (Griffith) pursuant to Rule 8–424 during the pendency of the appeal.

The Cochrans ask us to remedy the alleged errors by vacating the $5,544.88 interest award and remanding the case to the circuit court with instructions to enter an order "requiring payment of interest of $44,525.30 (from March 5, 2007 through the date of release of the amount deposited in the Registry of the Court on February 12, 2009) . . . ."

Griffith counters that the Cochrans have misinterpreted the acquiescence rule, which did not apply; that even if the rule applied the Cochrans could not engage in "a tactic of willful blindness" to obtain a "risk-free windfall of ten percent interest on the judgment while they pursued an . . . appeal"; that the e-mail and letters it sent to the Cochrans were valid, unconditional, and sincere tenders that tolled the accrual of post-judgment interest; that the circuit court did not exceed its authority in resolving the post-judgment interest dispute; and that Rule 8–424 is inapplicable to the issue in this case.

The circuit court resolved the post-judgment interest dispute by answering two questions corresponding to the Cochrans' main arguments: (1) did the acquiescence rule allow the Cochrans to decline payment of the judgment and continue to earn post-judgment interest while their appeal in *Cochran I*

was pending? and (2) did Griffith make a valid tender that at some point arrested accrual of post-judgment interest? As noted, the circuit court ruled that the acquiescence rule did not apply and that Griffith made an effective tender of the judgment in its March 8, 2007 e-mail. In doing so, the court applied legal principles to undisputed material facts. Accordingly, we review the court's ruling *de novo*. *Liddy v. Lamone*, 398 Md. 233, 247–48, 919 A.2d 1276 (2007). Before we do so, however, we shall address the Cochrans' argument that the court exceeded the scope of its authority in its ruling.

(a)

### *Did the circuit court lack authority to determine the amount of post-judgment interest owed?*

█ The Cochrans assert that the circuit court's power was "limited . . . to decid[ing] the date upon which th[e] mandatory obligation [to pay post-judgment interest] commence[d]" and therefore it could not determine "when [they] were entitled to interest and/or in what amount." This argument is completely without merit. To begin, there was no dispute that the judgment was recorded on March 5, 2007, and that post-judgment interest started to accrue from that date. *See* Md. Rules 2–604(b) ("A money judgment shall bear interest at the rate prescribed by law from the date of entry"); 2–601(b) ("The clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of the entry. That date shall be the date of the judgment."). The issue before the court, *which the Cochrans themselves raised* by opposing Griffith's motion to deposit, was when post-judgment interest *stopped* accruing. This issue was extensively briefed in motions filed by both parties and was argued before the court in a hearing. Thus, the court had authority to make findings and reach conclusions necessary to resolve the dispute before it.

The cases the Cochrans cite on this issue have no application. They quote *Brown v. Med. Mut. Liab. Ins. Soc'y*, 90

Md.App. 18, 30, 599 A.2d 1201, *cert denied,* 326 Md. 366, 605 A.2d 101 (1992), for its holding that "[t]here is no room for an equitable approach under Maryland law.... Maryland Rule 2–604(b) and its predecessors require ... that post-judgment interest be awarded from the date of the entry of judgment on the original verdict." As noted, however, there was no dispute in this matter over when post-judgment interest *started* to accrue; the dispute was over when post-judgment interest *stopped* accruing.

█ The Cochrans' discussion of *Mona v. Mona Electric Group, Inc.,* 176 Md.App. 672, 934 A.2d 450 (2007), is similarly unavailing. In that multi-issue case, we commented that "[t]he Court of Appeals has been clear that, when determining the date of entry of judgment for the purposes of calculating post-judgment interest, we must evaluate the circumstances on a case-by-case basis." *Id.* at 730, 934 A.2d 450. From this quote, the Cochrans reason that a court "has discretion only when the date of entry of judgment is at issue, [and] this [discretion] does not apply when there is an absence of any issue concerning [that] date...." Indeed, when the date of entry of judgment is not at issue, the circuit court has no discretion to decide when post-judgment interest begins to accrue because that question is clearly controlled by Rule 2–604(b). It does not follow, however, that when the date of entry of judgment is undisputed the circuit court lacks discretion to resolve any other matter related to post-judgment interest. Under the Cochrans' legal theory as now advanced, the circuit court would have lacked the authority to decide the very issue they placed before it when they challenged the amount of post-judgment interest Griffith had paid into the court. Moreover, the theory would limit a circuit court's power to decide matters related to post-judgment interest to those cases, and only those cases, in which the date of entry of judgment is in dispute. There is no authority for such a restriction and we cannot conceive of any justification for it.

Finally, the Cochrans' assertion that the court could not, in a non-evidentiary hearing, "fashion some sort [of] 'equitable'

relief" by "mak[ing] fact finding and adjudg[ing] the sincerity of [their] concerns [regarding the acquiescence rule] and [Griffith's tender letters]" is likewise confounding given the arguments they have made in this dispute. The Cochrans themselves placed these issues before the court by arguing (a) that they could not accept payment of the judgment because of the "risk" to their appeal in *Cochran I* under the acquiescence rule, and (b) that Griffith's tender letters did not stop the accrual of post-judgment interest because they were invalid. Furthermore, notwithstanding the court's characterization of some of its conclusions as "findings," the court did not need to resolve any factual disputes to decide the issues before it because the parties did not dispute any material facts. As noted, the questions before the court involved the application of legal principles to undisputed facts, *i.e.,* did the acquiescence rule apply to *Cochran I* such that the Cochrans could decline payment of the judgment and still collect post-judgment interest, and did the letters by Griffith constitute valid tenders that stopped the accrual of post-judgment interest? Thus, the Cochrans' argument that the circuit court went beyond the scope of its authority in its rulings is meritless.

### (b)

### *Did the acquiescence rule apply to the Cochrans' first appeal (Cochran I)?*

■ We now return to the circuit court's answers to the two main questions in this case. The court first determined that an exception to the acquiescence rule that had been applied in *Dietz v. Dietz,* 351 Md. 683, 720 A.2d 298 (1998), also applied here and therefore the Cochrans were "entirely wrong" in their view that they could not accept payment of the $230,000 judgment without forfeiting their appeal and, not being able to accept payment, post-judgment interest continued to run.

■ The acquiescence rule stems from the "well settled" principle that " 'the right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a

position which is inconsistent with the right of appeal.' " *Osztreicher v. Juanteguy,* 338 Md. 528, 534, 659 A.2d 1278 (1995) (quoting *Rocks v. Brosius,* 241 Md. 612, 630, 217 A.2d 531 (1966)). Thus, a litigant who " 'voluntarily accept[s] the benefits of a judgment or decree' " may not " 'later be heard to question its validity on appeal.' " *Id.* (quoting *Suburban Dev. Corp. v. Perryman,* 281 Md. 168, 171, 377 A.2d 1164 (1977)). *See also Dubin v. Mobile Land Corp.,* 250 Md. 349, 353, 243 A.2d 585 (1968) ("It is well settled in Maryland, and the law generally is to the effect, that if a party, knowing the facts, voluntarily accepts the benefits accruing to him under a judgment, order or decree, such acceptance operates as a waiver of any errors in the judgment, order or decree and estops that party from maintaining an appeal therefrom." (citing *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325 (1925)); *Mona,* 176 Md.App. at 723, 934 A.2d 450 ("An appeal must be dismissed 'if the appellant 1) accepts a benefit from or 2) acquiesces in or 3) recognizes the validity of the judgment or decree or 4) acts in a manner inconsistent with the maintenance of the appeal.' " (quoting *First Md. Leasecorp v. Cherry Hill Sand & Gravel Co.,* 51 Md.App. 528, 534–35, 444 A.2d 1053 (1982)). This rule is not without exception, however.

In *Dietz,* a divorce case, the wife was granted a monetary award of $225,000, which the court ordered the husband to pay in an initial lump sum of $20,000, followed by monthly payments of $1,250 for 15 years. The court entered a judgment to this effect. After receiving and depositing the initial $20,000, the wife noted an appeal from the judgment, arguing that the family farm should have been counted as marital property, which likely would have increased her monetary award, and the monthly arrangement was inequitable. The husband did not note a cross-appeal or otherwise challenge the amount of the monetary award or the method of payment. He moved to dismiss the appeal, arguing that the wife had forfeited her right to appeal by accepting partial payment of the judgment. This Court granted the husband's motion and dismissed the appeal. *Dietz v. Dietz,* 117 Md.App. 724, 701 A.2d 1144 (1997).

The Court of Appeals reversed, holding that "the acquiescence rule does not apply where there is no cross-appeal and the appellant seeks only an increase in an undisputed minimum." *Dietz*, 351 Md. at 695, 720 A.2d 298. The Court derived this exception to the acquiescence rule from a line of workers' compensation cases in which the claimants had accepted the payments awarded (which their employers had not contested) while at the same time appealing the amount of the payments awarded as insufficient. In addition, to make clear that "the holdings [from] the workers' compensation cases [were] not limited to that field of law," *id.* at 695, 720 A.2d 298, the Court noted that it had applied the same exception in *Shapiro v. Maryland–Nat'l Capital Park & Planning Comm'n*, 235 Md. 420, 201 A.2d 804 (1964), a condemnation case. Finally, the Court quoted with approval the Iowa Supreme Court's application of this exception in *In re Marriage of Abild*, 243 N.W.2d 541 (Iowa 1976):

> "When an appellant accepts only that which the appellee concedes, or is bound to concede, to be due him under the judgment or decree, he is not barred from prosecution of an appeal which involves only his right to a further recovery. Acceptance of part of the award in such circumstances is not inconsistent with the appellant's claim that the award should have been larger. This principle is applicable when an appellant in a [case involving marital property,] where there is no cross-appeal[,] accepts part of an award of cash ... while claiming entitlement to a larger award on appeal."

*Dietz*, 351 Md. at 696, 720 A.2d 298 (some alterations in original).

The *Dietz* Court reasoned that these were exactly the circumstances it was facing. The husband was not contesting the amount of the monetary award that had been made. The wife was arguing on appeal that the amount should have been higher because a valuable asset had not been counted as marital property. If the wife prevailed, she might be entitled to a higher award than she had been given. If she did not prevail, however, she still would have the uncontested award amount that she was granted. Therefore, by accessing that

uncontested minimum sum, the wife was not acknowledging the validity of that judgment amount. Thus, the wife had not acquiesced in the judgment by accepting the money that had been awarded and her appeal could proceed.

We agree with the circuit court that the exception to the acquiescence rule stated in *Dietz* applied to the circumstances in the case at bar.

As noted above, the damages the jury awarded the Cochrans for their negligence and breach of contract claims consisted of $55,000 for additional repair, remediation, and assessment to their house; $125,000 for diminution in value of the house; $10,000 for past loss of rental value of the house; $25,000 in pain and suffering for Robert; $15,000 in pain and suffering for Suzanne; and $0 for lost past wages for Robert.

The claims/damages the trial court did not allow the Cochrans to pursue, and that they were arguing, on appeal in *Cochran I*, they should have been allowed to pursue, were:

- Damages for breach of the Maryland Confidential Records Act. The Cochrans had claimed that certain of their medical records had been wrongfully disclosed by Griffith and its counsel to third-party expert witnesses; they sought compensation for emotional distress caused by that "violation."

- Damages for lost business opportunities due to the harm to their house caused by the fuel spill.

- Damages (and attorneys' fees) for violation of the Consumer Protection Act for misrepresentations by Griffith that its services would be the same or just as good as that of the Cochrans' prior oil service delivery company; that the transition from one company to the other would be "seamless"; and that (as stated in flyers it distributed) Griffith was an expert in oil delivery and had provided over 200 years of "quality and dependable service."

As explained, this Court in *Cochran I* agreed with the trial

court that none of these claims/damages were viable.[6] It is plain, however, that, had the Cochrans prevailed on any of their appellate arguments that they should have been allowed to pursue these claims/damages, that would not have had any impact on the $230,000 damages verdict they already had obtained. If the Cochrans had pursued and won the medical records and fraud claims they were championing, any damages they would have been awarded would have been in addition to the $230,000 already awarded. Likewise, any "lost business opportunity" damages obtained would have been above and beyond the $230,000 judgment amount. A damages award on a CPA claim may have duplicated, in part, the award already made, or may have exceeded it, but would not have diminished it. Finally, the only other contention the Cochrans were advancing on appeal in *Cochran I* was that the trial court had erred in imposing discovery sanctions. They were unsuccessful in this contention, as well, but even had they prevailed, that outcome would not have negatively affected the $230,000 judgment.

The Cochrans make two arguments as to why *Dietz* should not apply here. First, *Dietz* "involved [a] very specific [determination of] property . . . rights arising from a domestic case" and should therefore be limited to its facts. This argument is flatly contradicted by the *Dietz* Court's pronouncement that the exception to the acquiescence rule it was applying in that case was "not limited to [a specific] field of law." *Dietz*, 351 Md. at 695, 720 A.2d 298. Second, the Cochrans argue that this Court "limited" the holding in *Dietz* in *Chimes v. Michael*, 131 Md.App. 271, 748 A.2d 1065 (2000). We disagree.

---

6. We held in *Cochran I* that the Maryland Confidential Records Act did not preclude the defendant from divulging the records to their expert witnesses for purposes of formulating opinions on medical and mental health issues in the case. We further held that the claimed damages for lost business opportunities properly were disallowed as speculative. Finally, we agreed with the circuit court that the statements the Cochrans were basing their fraud claim on were at most puffery and sales generalities that were not actionable in fraud.

In *Chimes,* also a divorce case, the husband was awarded and immediately accepted a monetary award of approximately $1.5 million that had been calculated based primarily upon the value of certain stock options held by the wife that had vested during the marriage. We granted the wife's motion to dismiss the appeal on the ground that the husband had acquiesced in the judgment by accepting the monetary award. We distinguished *Dietz* as follows:

> As we read *Dietz* today, the Court of Appeals reached its conclusion based on the alimony-like effect of a scheme of monthly payments, rather than on that scheme's actual nomenclature. In workers' compensation, alimony, and condemnation cases, which the Court found analogous to the facts in *Dietz,* the defendant enters the litigation with a clear understanding that he owes a specific statutory or common law obligation to the plaintiff, whether it be the cost of medical treatment, support for necessities, or the fair market value of land. *See, e.g., Bethlehem Steel Co. v. Mayo,* 168 Md. 410, 413, 177 A. 910 (1935) (workers' compensation case, stating that acquiescence rule does not apply "where the right to the benefit received is conceded by the opposition party, or where the appellant would be entitled thereto in any event"). Here, the large lump sum award already enjoyed by Chimes does not have the support-like effect of the payments made in *Dietz.* The analogy is ineffective.

> *Dietz* is also distinguishable from the present case in that Mrs. Dietz only accepted a small portion of the judgment before she appealed. . . .

> Finally, although *Dietz* considerably broadens the exception stated in *Lewis*[7] to the acquiescence rule, it does not,

---

7. In *Lewis v. Lewis,* 219 Md. 313, 317, 149 A.2d 403 (1959), the Court of Appeals held that the acquiescence rule, "if applicable at all in a divorce case . . . cannot be raised where the benefits accruing to the [recipient party], by reason of the award, provide necessary support until the final adjudication of the case."

we believe, eviscerate that rule. If we were to construe *Dietz* as [the husband in] Chimes would like us to, we would open the floodgates for divorce litigants to collect on money judgments, then return to the court via the appellate process to ask for more money. We would also effectively require every payor on such judgments who finds herself before our Court to prosecute vigorously a cross-appeal— and not just present an appellate defense—in order to protect her interests. We cannot imagine that the Court of Appeals intended such a result when it handed down *Dietz*.

*Id.* at 285–87, 748 A.2d 1065 (emphasis omitted).

The Cochrans maintain that their case is more akin to *Chimes* than *Dietz* because, like the husband in *Chimes*, they would have received a lump sum award. Thus, they argue, their appeal would have suffered the same fate as the husband's appeal in *Chimes*. Although the Cochrans are correct that their judgment would have been paid in a manner similar to the lump sum monetary award in *Chimes*, the Cochrans' argument overlooks a critical distinction between the two cases. In *Chimes*, by accepting the monetary award that was determined based primarily on his wife's stock options, the husband acted at cross-purposes to his appeal challenging the equitable distribution of those same stock options.[8] Thus, the appeal in *Chimes* presented the exact situation the acquiescence rule is intended to prevent. *See Rocks v. Brosius*, 241

---

**8.** The husband attempted to reconcile this inconsistency by noting that his appeal was focused on the "if, as, and when" distribution of the non-vested options, whereas the immediate monetary award encompassed only the vested options. We rejected this argument as contrary to the Maryland law of equitable distribution. As we explained, that law treats all marital property as "a single pie to be divided between the divorcing parties[;] [t]hus, a judgment of divorce might divide the various forms of property in differing proportions, but at bottom it is a unitary plan for the distribution of assets." *Chimes*, 131 Md.App. at 282, 748 A.2d 1065. *Dietz* is distinguished by the fact that the property from which the wife sought an additional monetary award was not designated marital property and thus was never included in the "pie . . . divided between the divorcing parties."

Md. at 630, 217 A.2d 531 ("The right to appeal may be lost by ... taking a position which is inconsistent with the right of appeal.").

By comparison, in *Dietz*, the wife appealed on the ground that the trial court should have categorized her husband's farm as marital property when deciding whether to grant a monetary award, thus giving her a larger award accounting for the additional property. The wife's acceptance of a portion of the monetary award, which did not account for the farm, was not inconsistent with this position. Accordingly, the acquiescence rule did not preclude the wife's appeal. *See Dietz*, 351 Md. at 696–97, 720 A.2d 298 ("There is nothing inconsistent between Mrs. Dietz's acceptance of the monetary award that was made because of Mr. Dietz's Partnership interest and her request for an increase in the monetary award because of Mr. Dietz's interest in different property. Under these circumstances there has been no acquiescence in the judgment. . . ."). Conversely, the husband in *Chimes* was seeking to increase his share of the already-established marital property even though he had accepted the monetary award based on that property.

When considered in terms of inconsistency of actions, the present case more closely resembles *Dietz* than *Chimes*, for the reasons we already have explained. The Cochrans did not challenge the jury's verdict with respect to their negligence and breach of contract claim; rather they sought a new trial to recover additional damages and attorney's fees and costs under the CPA. *See supra* note 2; CL § 13–408 (authorizing a court to award attorneys' fees and costs in an action for damages under the CPA). Thus, just as the wife's acceptance of the monetary award in *Dietz* was not inconsistent with her claim on appeal that she was entitled to an additional monetary award based on property not included in the original calculation, the Cochrans' acceptance of the uncontested jury award would not have been inconsistent with their position on appeal that they were entitled to additional damages based on

evidence not submitted to the jury, and to attorneys' fees and costs under the CPA. Accordingly, the Cochrans would not have been "accept[ing] the benefits of a judgment or decree [while] question[ing] its validity on appeal," *Osztreicher*, 338 Md. at 534, 659 A.2d 1278, and thus would not have been subject to the acquiescence rule.[9]

The $230,000 judgment was not contested on appeal in *Cochran I* and for the reasons we have explained would not have been diminished by any outcome of that appeal. The judgment was an undisputed minimum damages award and therefore the Cochrans would not have taken a position inconsistent with their right of appeal by accepting payment of it. Therefore, the Cochrans would not have forfeited their appeal in *Cochran I* by accepting payment of the $230,000 judgment.

---

**9.** The Cochrans also cite *Silverberg* to argue that the acquiescence rule applied to their appeal. In that case, the wife appealed portions of a decree awarding her alimony and counsel fees while also seeking an attachment to collect the counsel fees. The Court of Appeals barred the appeal, holding as follows:

> The decree was not so separable for the purpose of an appeal. [The wife] had no right to hold fast to what the decree had given her, and, at the same time, seek an enlargement of the relief awarded her by the decree. To hold differently would be an arbitrary interpolation into the statute of a right not thereby granted, and would have an evil effect through the consequent encouragement to speculative appeals.... This appeal is neither within the terms of the statutory right of appeal nor supported by reason or authority. It involves the twofold error of at once splitting the decree and attempting both to accept and reject its terms.

148 Md. at 689, 130 A. 325.

The Court has since rejected this reasoning both expressly, *see Lewis*, 219 Md. at 316, 149 A.2d 403 ("[W]e are unwilling to follow the reasoning of [*Silverberg*] that the appeal involved splitting the decree and attempting both to accept and reject its terms."), and implicitly. *See Downtown Brewing Co. v. Ocean City*, 370 Md. 145, 149, 803 A.2d 545 (2002) ("Recognizing that the acquiescence doctrine is a severe one ..., we held that it should only be applied to actions taken by the same litigant that are necessarily inconsistent and that a claim on appeal that one is entitled to more money is not inconsistent.") (citations omitted); *Dietz*, 351 Md. at 696–97, 720 A.2d 298 ("There is nothing inconsistent between Mrs. Dietz's acceptance of the monetary award ... and her request for an increase in the monetary award because of Mr. Dietz's interest in different property."). Accordingly, *Silverberg* is not controlling on this point of law.

### (c)

### *Did Griffith make a valid tender of the judgment?*

 The second of the two central questions addressed by the circuit court was whether Griffith made a valid tender that stopped the accrual of post-judgment interest. A tender is "an offer to perform a condition or obligation, coupled with the present ability of immediate performance, so that if it were not for the refusal of cooperation by the party to whom tender is made, the condition or obligation would be immediately satisfied.'" *Platsis v. Diafokeris,* 68 Md.App. 257, 262, 511 A.2d 535 (1986) (quoting *Chesapeake Bay Distrib. Co. v. Buck Distrib. Co., Inc.,* 60 Md.App. 210, 214, 481 A.2d 1156 (1984)). The circuit court opined, based upon *Platsis, supra,* that a "tender does not require ... actual payment" but instead "requires an offer to perform a condition or obligation coupled with present ability of immediate performance ..." and concluded that "that is exactly what happened [in this case]." Specifically, the court determined that Griffith's March 8, 2007 e-mail, transmitted to counsel for the Cochrans three business days after entry of the judgment, was an unconditional tender.[10]

Furthermore, relying upon *Chesapeake Bay Distrib. Co., supra,* the court further ruled that, given the Cochrans' failure to respond to the March 8, 2007 offer of payment, it was not necessary for Griffith to make additional tenders. *See Chesapeake Bay Distrib. Co.,* 60 Md.App. at 214, 481 A.2d 1156 ("A tender is excused where the obligee has manifested to the obligor that tender, if made, will not be accepted, or that a tender would be at most merely a futile gesture.") (citing 15 *Williston, A Treatise on the Law of Contracts* § 1819 (3d ed. 1972)). As noted above, because Griffith had conceded it owed post-judgment interest from the date the judgment was en-

---

**10.** The trial court mistakenly observed that the March 8, 2007 payment offer was made one business day after the judgment was entered. In fact, it was made on the third business day after the judgment was entered.

tered through June 1, 2007, the court nevertheless awarded interest for that period.

The Cochrans maintain that the e-mail and written offers to pay were "set-up" letters (designed to "ensnare[ ]" them in a "trap") that did not meet the criteria for valid tender in numerous respects. The flaws alleged by the Cochrans include the following:

(a) the offers were based on incorrect assumptions and/or imposed impermissible conditions, including, (i) that the Cochrans were not appealing damages (May 30, 2007); (ii) that the time limit for filing a petition for writ of *certiorari* had expired (July 30, 2008); (iii) that the Cochrans were not filing any post-trial motions (March 8, 2007); and (iv) that Griffith required the Cochrans to hold it "harmless from any outstanding liens being asserted against the judgment." (July 30, 2008);

(b) that, despite its concession to owing post-judgment interest until June 1, 2007, Griffith tendered only the principal judgment amount;

(c) that actual payment, and not a mere tendering of payment, was necessary, and that Griffith stated only that it was "prepared to tender" the judgment, as opposed to making an actual tender;

(d) that an effective tender requires "a *'profert in curia'* ..., or 'payment of the amount tendered into court.' "

■ The only specific flaw the Cochrans identify with respect to the March 8, 2007 e-mail (which the circuit court found was a valid tender) is that it was "conditioned upon, and thus did not extend beyond the timely filing of [their] post-trial Motions...." To be sure, a tender that "contains a condition 'which would prejudice the creditor's right[s]'" is invalid. *Platsis,* 68 Md.App. at 262, 511 A.2d 535. The March 8, 2007 e-mail did not impose such a condition, however. It merely stated that "[w]e do not foresee filing any post trial motions" and in fact made clear that Griffith "wishe[d] to put the matter behind [it]" by "cut[ting] the check for the judgment." The only supposed "condition" imposed by Griffith

was its request for the information necessary to make payment, including the Cochrans' social security numbers and the tax identification number for counsel's law firm. This request was not a condition. It was an attempt to obtain factual information necessary to process the check for payment, not a condition that rendered the tender invalid.

Furthermore, the March 8, 2007 e-mail was a valid tender even though it did not specify the amount of post-judgment interest that had accrued since the date of entry of the judgment and offer to pay that sum as well as the $230,000 judgment amount. Rule 2–604(b) mandates the accrual of interest on a money judgment from the date of entry, at the legal rate (10%). Accordingly, the post-judgment interest must be paid to satisfy the judgment. The dollar amount of the post-judgment interest accrued changes daily, however, thus becoming a moving target. If Griffith's March 8, 2007 e-mail had specified the amount of postjudgment interest accrued and therefore owing on the third day post-judgment, the information would have been stale by the following day.

Given that payment of post-judgment interest, in a daily changing amount, is legally required to satisfy a money judgment such as the one entered in this case, we agree with Griffith that it is implicit, in an offer to pay a money judgment, to pay the required post-judgment interest due on the judgment on the date payment in fact is made. Griffith's March 8, 2007 e-mail stating, "[w]e would like to start the process to cut the check for judgment," meant that the check would be in an amount equal to $230,000 plus post-judgment interest.

On the offer to pay versus actual payment issue, we do not read the relevant cases—*Platsis, supra,* and *Chesapeake Bay Distributing Co., supra*—to equate "tender" with the actual payment of money. As noted above, in the *Chesapeake Bay* case, we adopted the following definition of "tender":

"an offer to perform a condition or obligation, coupled with the present ability of immediate performance, so that if it were not for the refusal of cooperation by the party to whom tender is made, the condition or obligation would be immediately satisfied."

60 Md.App. at 214, 481 A.2d 1156 (quoting 15 Williston, *A Treatise on the Law of Contracts*, § 1808 (3d. ed. 1972)). *See also Platsis*, 68 Md.App. at 262, 511 A.2d 535. It is undisputed in the case at bar that Griffith's March 8, 2007 e-mail sought the information necessary for it to process a check for payment of the judgment against it; and that, with that information, Liberty Mutual, as Griffith's insurer, could have immediately produced the check. Thus, the March 8, 2007 e-mail was an offer to pay the judgment coupled with the present ability of immediate performance, so that, had the Cochrans cooperated, the judgment would have been satisfied, *i.e.*, a tender.[11]

▮ Finally, there is no merit in the Cochrans' argument that a valid tender requires a *profert in curia*. In support of this proposition, the Cochrans rely solely on *Forwood v. Magness*, 143 Md. 1, 121 A. 855 (1923), which they acknowledge "involved a note, not a judgment." Besides this distinction, the *profert in curia* requirement referenced in *Forwood* plainly does not apply to the circumstances in this case:

> The effect of a tender is to arrest the running of interest and to relieve the debtor of liability for costs, but in order to have that effect the tender must, in certain cases, be kept good, and *where the debtor is subsequently sued and the tender is relied upon as a defense*, it must be specially pleaded, and the plea must be accompanied by a *profert in curia*, or payment of the amount tendered into court.

*Id.* at 6, 121 A. 855 (emphasis added).

In any event, we also agree with the circuit court that, under the circumstances here, tender was made futile/excused

---

**11.** The Cochrans argue that the March 8, 2007 e-mail could not have constituted a valid tender because, after it was sent, but before the ten day deadline for filing post-judgment motions, they filed post-judgment motions, including a motion to revise judgment. For the same reasons we have discussed respecting the acquiescence rule, the March 8, 2007 e-mail was not disqualified from being a tender because the Cochrans later filed a motion to revise the judgment. The Cochrans do not suggest that in their motion to revise the judgment they sought to reduce the judgment.

by virtue of the Cochrans' failure to respond to the offers and, as result, the Cochrans were not entitled to post-judgment interest beyond June 1, 2007. We have explained that the need to make a tender is excused if the

> "claimant dispense[s] with its production, by express declaration or equivalent act, as if a party declare before hand that a tender will not be accepted . . .", *Shannon v. Howard Mutual Building Association of Baltimore,* 36 Md. 383, 392 (1872), *see Buel v. Pumphrey,* 2 Md. 261, 268 (1852); *Johnson v. Wheeler,* 174 Md. 531, 539, 199 A. 502 (1938), or the creditor makes clear to the debtor that tender would be a futile gesture.

*Platsis,* 68 Md.App. at 262–63, 511 A.2d 535 (alterations in original) (some citations omitted).

The Cochrans did not respond to the March 8, 2007 e-mail seeking basic information needed to issue a check in payment of the judgment, nor did they respond to a subsequent letter that again offered to pay the judgment and stated that the tender would be considered rejected if no response were received by June 1, 2007. Thus, by their "refusal of cooperation," *Platsis,* 68 Md.App. at 262, 511 A.2d 535, the Cochrans made it clear to Griffith that tender would not be accepted. Indeed, the Cochrans do not dispute that they received the March 8, 2007 e-mail and the May 30, 2007 letter and chose not to respond; nor do they argue that they would have accepted a tender if Griffith had remedied the alleged deficiencies in its offers. Rather, the Cochrans make plain that they had no intention of accepting payment of the judgment prior to the termination of their appeal in *Cochran I* because they believed (incorrectly) that by doing so, they would have forfeited the appeal under the acquiescence rule.

The Cochrans argue that in *Chesapeake Bay Distrib. Co.,* 60 Md.App. 210, 481 A.2d 1156, we refused to recognize a pretender rejection by a judgment creditor under similar circumstances. That case is not analogous. There, Chesapeake Bay Distributing Company ("Chesapeake") obtained a $71,496.50 judgment against Buck Distributing Company ("Buck") on

June 14, 1982. We described the remainder of the relevant facts as follows:

> On July 13, 1982, counsel for Buck telephoned counsel for Chesapeake and expressed his client's "readiness, willingness and ability to pay" the amount owed. Counsel for Buck testified that he told Chesapeake's counsel that he had a check for the amount of the judgment and requested instructions as to how the check should be made out and where it should be sent. Counsel for Chesapeake testified that he had replied that his client "planned to take an appeal of the matter" because he believed the amount of the judgment was insufficient in that the court allowed loss of profits only for the three years prior to suit. He denied having specifically told appellee's counsel not to send the check and stated that he had no right to refuse or to accept the money as he was only trial counsel. Nevertheless no payment was made to Chesapeake's counsel or into court.

*Id.* at 212, 481 A.2d 1156.

In a subsequent dispute over the proper amount of post-judgment interest, the circuit court determined that the statement by counsel for Chesapeake that he planned to take an appeal served as a constructive rejection of Buck's tender, thus rendering actual production of the funds unnecessary. We reversed, reasoning that

> [t]he only plausible interpretation of [the July 13] conversation is that counsel for Buck called to arrange to pay the judgment in order to close the case since the appeal time was about to run. Counsel for Chesapeake perceived this as the reason for the call and put opposing counsel on notice that his client intended to appeal. His intent was not to reject the tender, but to treat counsel fairly by notifying him of the status of the case. Whether Chesapeake would have refused the check on July 13 is purely speculative. It is inconceivable that Chesapeake would have returned a check in full payment if assured that the appeal would not

be affected. It is equally clear that Buck did not intend to make an unconditional payment.

*Id.* at 215–16, 481 A.2d 1156.

Thus, in *Chesapeake* we interpreted Buck's tender as being conditioned upon Chesapeake's not bringing an appeal, and we saw no evidence that Chesapeake intended to reject the tender. In the instant case, Griffith's March 8, 2007 e-mail offer was unconditional and made well before the time to note an appeal was to expire. In addition, its subsequent May 30, 2007 offer was made with the express understanding that the Cochrans intended to pursue an appeal. The statement in that letter that, "If the verdict is not being appealed, there is no reason to not resolve the judgment as we had expressed back on March 8, 2007[,]" was not, as the Cochrans argue, a condition on payment. Rather, it was an acknowledgment that there was no reason for the Cochrans *not* to accept payment if they were not appealing the verdict, *i.e.*, accepting payment would not preclude their appeal under the acquiescence rule.

More significantly, unlike in *Chesapeake*, in which we could not determine whether Chesapeake intended to reject the tender if made, in this case the Cochrans have readily acknowledged that they would not have accepted a proper tender because they feared forfeiting their appeal. Thus, notwithstanding the Cochrans' complaints that the payment offers were inadequate to constitute tenders, they made clear (and have continued to make clear) that they would not have accepted a tender even if it was to their satisfaction.

The Cochrans' concern with the acquiescence rule did not entitle them to ignore tenders and continue to accrue post-judgment interest at the rate of 10% while their appeal in *Cochran I* was pending. If we were to conclude otherwise, successful plaintiffs could reap an unfair benefit by using the acquiescence rule as a shield to evade payment during the pendency of an appeal and later claim entitlement to post-judgment interest at the expense of a debtor-defendant who was attempting to pay the judgment. This would be contrary

to the purpose of post-judgment interest, which is to compensate the plaintiff who, through no fault of his own, is denied use of the money he is otherwise entitled to. *See Med. Mut. Liab. Ins. Soc'y v. Davis,* 389 Md. 95, 99–100 n. 3, 883 A.2d 158 (2005) ("[T]he purpose of post-judgment interest is obviously to compensate the successful suitor for the same loss of the use of the monies represented by a judgment in its favor, and the loss of income thereon, between the time of entry of the judgment *nisi*—when there is a judicial determination of the monies owed it—and the satisfaction of the judgment by payment.") (quoting *Med. Mut. Liab. Ins. Soc'y of Md. v. Davis,* 365 Md. 477, 484, 781 A.2d 781 (2001)). Accordingly, we hold that the requirement that Griffith tender the judgment was excused by June 1, 2007, at the latest, and that post-judgment interest ceased accruing on that date.

### (d)

### *Applicability of Md. Rule 8–424*

Before moving to the Cochrans' second contention, we must briefly address their argument that Liberty Mutual should have acted pursuant to Rule 8–424 to protect Griffith's interests. Rule 8–424 states:

> When an appeal is taken from a judgment entered against an insured in an action defended by an insurer under a policy of insurance, all proceedings to enforce the judgment pending the appeal shall be stayed to the extent of the policy coverage, if the insurer files with the clerk of the lower court an affidavit of one of its officers or authorized agents describing the policy and the amount of coverage, together with a written undertaking that if the judgment is affirmed or modified or the appeal is dismissed, the insurer will pay the judgment, or that part affirmed, to the extent of the limit of liability in the policy plus interest and costs. The insurer shall serve a copy of the affidavit and undertaking on the judgment creditor. The insurer shall also give written notice to the insured that (a) the enforcement of the judgment to the extent of the limit of liability is stayed with respect to the insured and (b) if the limit of liability is less

than the amount of the judgment, the insured may obtain a stay of enforcement of the balance of the judgment by filing a supersedeas bond in an amount set pursuant to Rule 8–423, not exceeding the balance.

We fail to see how this rule has any effect on the post-judgment interest dispute in this case. First, the clear purpose of the rule is provide a mechanism for an insurer to prevent a successful plaintiff from executing on the judgment when the insured intends to appeal the adverse verdict. The rule by its terms does not apply when, as in this case, the insurer, on behalf of its insured, is attempting to pay the judgment and the prevailing plaintiff is rejecting payment to preserve an appeal. Second, even if the rule did apply to the circumstances in this case, it would have no effect on the amount of interest ultimately owed by Griffith. Thus, Rule 8–424 does not support a conclusion that the circuit court erred in its award of post-judgment interest.

## II.

### Recusal Motion

On December 4, 2008, one day after Griffith filed its motion to deposit, it filed a motion to shorten the time for the Cochrans to file a response to that motion, arguing that the discovery requests the Cochrans had filed conflicted with the approaching holidays and the court's resolution of any dispute over post-judgment interest would render the discovery requests moot. In an order filed that same day the court granted the motion to shorten time and set a deadline of December 15, 2008, for the Cochrans to respond to the motion to deposit.

On December 8, 2008, the Cochrans filed an opposition to the motion to shorten time, noting that the amount in dispute was nearly $50,000, and therefore the case was not "a matter which should be summarily decided." They further argued that shortening the time for responding to the motion to deposit would cause undue hardship, that there were no "exigent circumstances" justifying a shortened response time,

and that they already had agreed voluntarily to stay discovery pending good faith efforts to resolve the dispute.[12]

On December 15, 2008, the Cochrans filed an opposition to Griffith's motion to deposit. They maintained that post-judgment interest was still running against Griffith, and argued that, had they accepted payment of the judgment when offered, they would have forfeited their appeal under the "acquiescence rule." They referred to the payment offers by Griffith as "set-up" letters and asserted that they were "based on predicates that either were, or became, incorrect."

Also on December 15, 2008, the Cochrans filed a motion for recusal. They pointed out that the circuit court judge assigned to their case (the same judge who had presided over the jury trial) had granted Griffith's motion to shorten time before an opposition to it could be filed and had granted part of the relief requested in the motion to deposit before even the shortened response time had elapsed. They further noted that in *Cochran I* this Court had not upheld the judge's ruling "on the critical issue of the fraud allegation ... based on [Griffith's] concealment and misrepresentation of an increased benzene risk at the family home, and [had] sharply criticized the [judge's] exercise of discretion regarding the [discovery sanctions imposed on the Cochrans]." They asserted that Griffith had attached as an exhibit to its motion to deposit an "unredacted copy of a letter from [the Cochrans'] counsel which raise[d] [this Court's] rejection of [the judge's] ruling on the critical fraud issue." On those bases, the Cochrans sought recusal of the circuit court judge.

On December 23, 2008, the judge issued an order denying the recusal motion. He explained in the order that there was

---

12. On this latter point, the Cochrans included as an attachment an e-mail message, sent December 2, 2008, from their counsel to counsel for Griffith stating:

> I am heading out of state for depositions, but will set up a conference to attempt to resolve the discovery issue in good faith with you. Please treat the discovery as stayed until we have made an attempt to resolve the outstanding issues. We will, obviously, work with you regarding any dates, should a deposition become necessary.

no cause for recusal because "any action in signing an order before it was ripe was merely a mistake and done with the assumption that there would be no opposition," and that, contrary to the suggestion made in the recusal motion, the "case was not reversed on appeal" in any event.

■ The Cochrans contend in this appeal that the trial judge erred by not recusing himself from the post-judgment interest dispute. Citing *Doering v. Fader*, 316 Md. 351, 558 A.2d 733 (1989), the Cochrans first argue that "Maryland law well recognizes the risk presented by allowing a judge who has not been upheld on appeal of again deciding the case." This argument is both factually and legally inaccurate.

In *Doering*, Judge Fader presided over a murder trial in which the jury convicted the defendant and sentenced him to death. The conviction was affirmed on appeal but the sentence was vacated because certain items of evidence had been improperly excluded from the sentencing proceeding. The case was remanded for a new sentencing hearing. On remand, Judge Fader sought to recuse himself because he had previously formed an opinion, based on the evidence introduced at trial and at sentencing, that the death penalty was not an appropriate punishment for the defendant. The defendant responded by filing a petition for writ of mandamus with the Court of Appeals asking it to direct Judge Fader to preside at the new sentencing.

After reviewing the pertinent portion of Canon 3C of the Maryland Code of Judicial Conduct, Md. Rule 1231,[13] as well as numerous decisions on the subject from federal and state courts, the Court of Appeals found all of the authorities in agreement that recusal is required only when the source of the

---

**13.** The cannon of judicial conduct discussed in *Doering* is now Canon 3D, Md. Rule 16–813, which states in relevant part:

D. **Recusal.** (1) A judge shall recuse himself or herself from a proceeding in which the judge's **impartiality** might reasonably be questioned, including an instance when:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer or extra-judicial **knowledge** of a disputed evidentiary fact concerning the proceeding[.]

alleged bias is information received outside the courtroom. As the Court explained, the "four corners of the courtroom" test is

"really an alternative formulation of the rule that bias must be personal rather than judicial before recusal will be required. The proper distinction is between a judicial determination derived from evidence and lengthy proceedings before the court, and a determination not so founded upon facts brought forth in court, but based on attitudes and conceptions that have their origins in sources beyond the four corners of the courtroom."

*Id.* at 355–56, 558 A.2d 733 (quoting *In re Evans*, 411 A.2d 984, 995 (D.C.App.1980))

Applying this principle to the circumstances in *Doering*, the Court remarked that it saw "nothing in th[e] record to suggest that Judge Fader [had] received any information other than that which was properly produced during previous court proceedings in th[e] case," and thus, he had "misperceived the nature of the extrajudicial facts he was precluded from considering," *Id.* at 357–58, 558 A.2d 733.[14]

█ The only mention in *Doering* of the possibility of bias resulting from a reversal on appeal was the Court's statement that "we [do not] have the situation of a defendant seeking recusal because he fears retribution from a judge whose ruling was reversed on appeal." *Id.* at 358, 558 A.2d 733. We will not extrapolate from this brief comment, on an issue not before the Court, a blanket rule that recusal is necessary whenever a case returns to a judge who has been reversed on appeal. In fact, Maryland precedent is directly the opposite. *See Boyd v. State*, 321 Md. 69, 78, 581 A.2d 1 (1990) (" 'This Court has recently stated that, in the absence of a constitu-

---

**14.** Although the Court concluded that it would be appropriate for it to issue the writ of mandamus under the circumstances, it chose to first direct Judge Fader to reconsider his recusal based on the standard the Court had enunciated.

tional or statutory provision to the contrary, the Judge who presided at the trial of a case which is reversed on appeal and remanded for a new trial is not disqualified to retry the case.' ") (quoting *Thanos v. Superintendent,* 204 Md. 665, 667–68, 104 A.2d 926 (1954)); *Carey v. State,* 43 Md.App. 246, 249, 405 A.2d 293 (1979) ("Participation in prior legal proceedings involving related parties or issues is simply not grounds for a judge to recuse himself.") (citation omitted).

Moreover, even if the Cochrans had correctly stated the law, their argument fails on the facts. In *Cochran I,* we affirmed the judge's rulings on every appellate issue they presented.

The Cochrans also cite *Goldberger v. Goldberger,* 96 Md. App. 313, 624 A.2d 1328 (1993), to argue that the test for recusal is not whether actual bias can be proven but "whether the appearance of fairness is being preserved." Indeed, in *Goldberger* we commented that "recusal may be required not only when the trial judge has an actual personal bias against a party, but also when the trial judge creates a situation in which it would appear that he could not, with impartiality, preside at the subsequent trial." *Id.* at 321, 624 A.2d 1328 (citations omitted). The Cochrans argue that the presiding judge in this case created an appearance of impropriety when he "shortened the deadline for the Opposition to the Motion [to Deposit] and then granted part of the relief sought before the shortened deadline even passed." The Cochrans provide no explanation, however, as to how the partial relief granted by the judge (specifically, the order directing that the judgment funds be deposited in the court registry) prejudiced them or otherwise evidenced a personal bias against them.

The judge in the case at bar did not abuse his discretion or otherwise err in denying the recusal motion. *See, e.g., id.* at 318, 624 A.2d 1328 ("Recusal is a discretionary matter, and the judge's decision denying recusal should not be overturned unless clearly wrong.") (citations omitted).

## III.

### Griffith's Motion to Strike Portions
### of the Cochrans' Reply Brief

On December 10, 2009, Griffith filed in this Court a motion to strike the appendix and other portions of the Cochrans' reply brief. The appendix to the Cochrans' reply brief consists of a single document: a photocopy of a check purportedly issued by Liberty Mutual on August 22, 2008, in the amount of $230,000, made payable to "Circuit Court for Washington County, Dennis Weaver Clerk of the Court." The parties do not dispute that the check never was submitted to the circuit court or offered to the Cochrans, and that it is not contained in the record.

Griffith argues that the appendix and all references to it in the Cochrans' reply brief should be stricken pursuant to Rule 8–501(f) because the document is not part of the record.[15] It argues additionally that the Cochrans violated Rule 8–504(a)(5) by making arguments based on the check in their reply brief that were not in their initial brief. *See* Md. Rule 8–504(a)(5)(requiring that a brief include "[a]rgument in support of the party's position"); *Chang v. Brethren Mut. Ins. Co.,* 168 Md.App. 534, 550 n. 7, 897 A.2d 854 (2006) (concluding pursuant to Rule 8–504(a)(5) that an argument made for the first time in a reply brief was not properly before this Court); *Fed. Land Bank, Inc. v. Esham,* 43 Md.App. 446, 459, 406 A.2d 928 (1979) ("The function of a reply brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue clearly each point of his appeal. We think that the reply brief must be limited to responding to the points and issues raised in the appellee's

---

**15.** Rule 8–501(f) provides:

> **Appendix in appellant's reply brief.** The appellant may include as an appendix to a reply brief any additional part of the record that the appellant believes is material in view of the appellee's brief or appendix. The appendix to the appellant's reply brief shall be prefaced by a statement of the reasons for the additional part. The cost of producing the appendix may be withheld or divided under section (b) of Rule 8–607.

brief."). *See also Beck v. Mangels,* 100 Md.App. 144, 640 A.2d 236 (1994) (and cases cited therein). Finally, Griffith argues that additional portions of the Cochrans' reply brief unrelated to the check should be stricken pursuant to Rule 8–504 for failing to reference the record and/or failing to include a proper supporting argument. *See* Md. Rules 8–504(a)(4), 8–504(a)(5) (requiring, respectively, that a brief include, "[r]eference ... pages of the record extract supporting the assertions" and "[a]rgument in support of the party's position").

The reason stated by the Cochrans for including the photocopied check as an appendix to their reply brief is that they "discovered [its] existence ... following the filing of [their] Brief on September 10, 2009." *See* Md. Rule 8–501(f) (stating that the inclusion of any additional part of the record as an appendix to the reply brief "shall be prefaced by a statement of the reasons for the additional part"). The Cochrans argue that the document "was not in existence at the time the record was transmitted" and that its exclusion would result in the presentation of an "incorrect and/or misleading record" to this Court. The Cochrans assert that "[n]othing in the Rules suggest that a matter which was not in the record because it did not exist and could not be part of the record should be stricken."

 On the contrary, Rule 8–501(f) specifies that an "appellant may include as an appendix to a reply brief any additional part *of the record*[16] that the appellant believes is material in view of the appellee's brief or appendix." (Emphasis added.) *See also* Md. Rule 8–501(c) ("The record extract shall contain all parts *of the record* that are reasonably necessary for the determination of the questions presented by the appeal ....") (emphasis added). Parties to an appeal are " 'not entitled to supplement the record by inserting into the

---

**16.** The "record" on appeal consists of "(1) a certified copy of the docket entries in the lower court, (2) the transcript required by Rule 8–411, and (3) all original papers filed in the action in the lower court except a supersedeas bond or alternative security and those other items that the parties stipulate may be omitted." Md. Rule 8–413(a).

record extract [or, as in this case, the appendix to a reply brief] such foreign matter as [they] may deem advisable.'" *Rollins v. Capital Plaza Assocs., L.P.,* 181 Md.App. 188, 200, 955 A.2d 869, *cert denied* 406 Md. 746, 962 A.2d 372 (2008) (quoting *Community Realty Co. v. Siskos,* 31 Md.App. 99, 102, 354 A.2d 181 (1976)).

This restriction is inherent in the scope of review prescribed by Rule 8–131, which generally limits the task of an appellate court to deciding only those issues that "plainly appear[ ] by the record to have been raised in or decided by the trial court." Md. Rule 8–131(a). Facts outside the record cannot be argued to or considered by the trial court, and thus have no influence on its judgment. Accordingly, an appellate court must confine its review to the evidence actually before the trial court when it reached its decision. *See Hamilton v. State,* 127 Md. 312, 314, 96 A. 523 (1916) ("Questions of law arise out of and depend upon facts, and in the absence of the facts upon which the judgment of the Court below was founded, we cannot entertain an appeal questioning its correctness."). This is true regardless of whether the excluded fact(s) existed at the time of trial.

For these reasons, we shall grant Griffith's motion to strike.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**